Allshouse v. Bank & Trust Co.

Common Pleas Court of Summit County.

Decided February 25, 1932.

*Frank, Ream* and *Schenz,* for plaintiff.
*S. A. Davies* and *C. C. Chisnell,* for defendant.

WANAMAKER, J.

This was an action brought by the plaintiff for an accounting, cancellation and satisfaction of a mortgage, and to quiet title to specific real estate. The plaintiffs are residents of the city of Akron and owners of the residential property in question, upon which they executed a so-called trust deed to secure the payment of $2,700.00, evidenced by so-called bonds, and $516.60 evidenced by promissory notes, the entire amount attempted to be secured payable in monthly installments for the period of ten years in the sum of $35.78.

The defendants, two in number, compose the successor to the Ohio State Bank & Trust Company, upon which personal service was had, and which was the grantee of the so-called trust deed, and also the defendant, the Southern Securities Corporation, of Ashland, Kentucky, served by publication, as a foreign corporation, for whose primary benefit the conditions of the trust deed were provided.

The plaintiffs claim the contract entered into between themselves, as grantors of the so-called trust deed, and the Ohio State Bank & Trust Company, as trustee, and the Southern Securities Corporation, as *cestui que trust,* is illegal in part because of a claimed usurious rate of interest.

Personal appearance, by way of defense, to this action was only presented by the trustee, the Ohio State Bank & Trust Company, and in presenting its defense to the action of the plaintiff, the Ohio State Bank & Trust Company seeks to set up all of the defenses available upon all theories of the case to all other and subsequent persons, who are not either personally before the court or parties to the action.

The first question presented is the plaintiff's claim of usury, which is denied by the defendant. This claim of usury arises out of the conduct of the plaintiff in following a provision of the trust deed permitting an acceleration of payment of the amount due on the obligations recited as secured by the trust deed, and it is stipulated by the parties, that plaintiffs have taken the steps necessary to accelerate their payment right, and are entitled to a surrender of the securities issued by them, if the amount of their tender is permitted to be less than the amount of the face value of the securities. It is further stipulated by the parties that the amount of the tender actually made is not to be construed as a failure of the right of payment simply because it might differ in a minor respect as to the actual amount due.

The contention submitted to the court for consideration is the refusal of the trustee to accept anything less than the face value of the securities.

This question of usury is a matter in which the decisions of the courts of Ohio give little assistance. The court is

well aware that courts in nearly every other jurisdiction of the United States have decided questions of this kind repeatedly and with great effort. To properly determine what the rule should be we must interest ourselves primarily with its origin, with its reasons, and not least by any means, with its utility to the general public which is presumed to know the law as pronounced by our courts as well as by our legislatures.

The law against usury was made necessary and originated by reason of evil practices that prevailed to an alarming degree in the loaning of money, and out of that condition came the prohibition by express statute, which reads as follows:

"8303. *Maximum rate.* The parties to a bond, bill, promissory note, or other instrument of writing for the forbearance or payment of money at any future time, may stipulate therein for the payment of interest upon the amount thereof at any rate not exceeding eight per cent per annum, payable annually."

The words in this section must be construed with a view to, and in the light of, the conditions which brought about its enactment. All laws pertaining to usury are enacted for the protection of the borrower, and are not simply idle pronouncements to the lender of that amount which he may expect to receive by way of profit. Bearing that provision in mind it will not be as likely that one will go astray in the names or words, schemes, representations and pseudo-relationships that are constantly and continuously used and, in some cases, permitted to do violence to the statute and its purpose.

A large part of the body of our law governing the conduct of individuals is made by the pronouncement of the courts, and those courts hold the lay mind responsible for knowledge of what those pronouncements have been and how they shall be applied to them in their business.

It has often been said that it is the duty of courts to interpret the law as it is, not as they think it should be. This is recognized by us all. And yet one of the greatest causes of litigation today is either the inaccurate application of a rule by a court or the pronouncement of a rule so ingenious in itself and so involved, or so cluttered up

with words and phrases, as to make its meaning obscure and unintelligible even to trained minds. These rules, even though they be such, are rules of conduct for the lay person, and courts hold the lay person responsible for his acts, presuming a full knowledge of such rules.

It is appreciated further by this court that courts of last resort in other jurisdictions have seen fit to lay down rules pertaining to usury that in their application are referable particularly to the facts of the transaction then before the court and, primarily, in view of the reasonableness of it. Such a rule is no rule at all, for the yardstick of determination of the existence or non-existence of usury should be a fixed one that the lay mind can comprehend and not one that requires resort to the courts for a rule on each set of facts.

Having in mind, therefore, the purposes of the act in its inception and the need for a rule understandable by laymen as well as courts, the court expresses the following rule for determination of usury: if the total amount contracted to be paid by the borrower before, for, or after the use of the money actually received for the period of time it is used, regardless of the names used for various charges, is in excess per annum of eight per cent, then the excess is usurious.

This was the purpose and intent of the law. This is a rule easily followed and understood by all. This court is not concerned with the proposition of whether or not eight per cent is sufficient money to receive by way of return in lending money; that is a matter to be determined by the State legislature.

In the case at bar the system used was disguised to the 'nth degree in an effort to make the transaction seem and appear to be something contrary to what it was. More recitation of words does not alter a relationship that existed in fact. To wink the eye as was done in the Kentucky case, *The Union Central Life Insurance Co.* v. *Edwards,* 219 Ky. 748; 294 S. W. 502, and recognize the existence of loan brokers, and pretend that they are an independent business dependent upon a need by the general public to an equal degree as they are needed by the money lender, is to do violence to the whole spirit of the law of usury. To say that they are servants of the

borrower and the lender, and that their existence is required as much for the borrower's sake as for the lender's sake, is to delude one's mind with false premises from the commencement of the argument. Brokers having contracts with financial houses, that deny themselves to be money lenders and who pretend to act as fiscal agents instead of lenders of money, have simply put another dress upon the act itself. It is ridiculous to contend that the lender, who lives and exists entirely by virtue of the return he receives upon the use of his money, is no more interested in the loan broker than the individual of the general public who has perhaps one or two occasions in a life time to resort to the borrowing of money. It is a ficticious supposition.

If money lenders can entrench themselves behind a system of successive steps between themselves and the borrower there is no limit to what extent that might be permitted. The statute does not say "a reasonable sum in excess of eight per cent," it says, "eight per cent."

If the money lender is permitted to cast from his shoulders the burden and expense of getting business to the burden of the borrower by the means of the broker, then can he not likewise throw off of his shoulders the burden of maintaining an office and clerical work to keep records and accounts of those loans by having and maintaining that as a separate service and as independent of the act of lending as he has pretended to make the act of the broker?

If this system and subterfuge is to be tolerated by the courts then the railroads and all other agencies controlled by law as to rate of fee charged have neglected an avenue of revenue that should at once be taken advantage of by them. If the rate of fare for transportation is so many cents per mile then why could not the depot be divorced from the service of transportation and be recognized, as the loan broker has been in Kentucky, as a thing of primary convenience to the public and not incident to a part of the transportation itself, and let each depot be leased out to a broker to sell the tickets and permit him to make a charge for his services in maintaining the the depot and providing the accomodations therein had for the general public. The similarity of subterfuge is

marked, definite and exact. It is not known to have been tried, but it would meet with much less success in the courts, and the failure of such a subterfuge in that illustration should be equally certain and assured in this situation.

The court therefore holds this was a usurious contract illegal in part at its inception.

The next question is even more difficult of determination, viz: the defendant trustee now presents to the court evidence in support of a defense unquestionably a defense proper to be urged by the present holders of the securities, which the court finds are now protected by the law of negotiable instruments, having been negotiated. This court is undetermined as to the propriety of admitting evidence offered under the cloak of a defense of the trustee which is palpably from the evidence in fact a defense for the benefit of parties who have failed to avail themselves of their legal and equitable rights by entering an appearance and subjecting themselves to the jurisdiction of this court.

There is no evidence before this court of any pecuniary advantage or consideration passing to the trustee from the relationship of the plaintiff with the trustee, or of the trustee with those for whom it holds the security, as would indicate any damage to the trustee as such, by granting the relief prayed for by the plaintiff and only defended against by the trustee. This court being unable to determine this question which has been raised in the court's mind *sui sponte* for the first time, and not being urged by counsel resolves the question in favor of the defendant, and thereby admits all of the testimony and the evidence offered by it for the purpose of prevailing in the second defense, which contends that the security of the trust deed cannot be altered or impaired because the instruments which it secures have been negotiated to *bona fide* purchasers.

It seems to plainly appear to any one studying the general subject of *bona fide purchasers* of negotiable instruments secured by mortgages, that there is considerable conflict in the decisions. If, however, the case of *Bailey* v. *Smith,* 14 O. S., 396, is read in conjunction with the most splendid opinion by Shauck, J. in *Timmerman*

v. *Howell, et al,* 1 Ohio Circuit Decisions, 342, and Shauck, C. J. in *Bank* v. *Brotherton,* 78 O. S., 162, it will be plainly understood that this general subject—of *bona fide* purchasers of negotiable instruments secured by mortgage —must be divided into three classifications:

"First—Those in which the equities, or—more correctly speaking—the defenses of the mortgagor have been asserted against the instrument in the hands of an assignee without notice.

"Second—Those in which the controversy involved the equitable rights of such assignee and the latent equities of third persons in the mortgage assigned.

"Third—Those in which the court was called upon to determine the relative rights of such assignee and the holder of a latent equity in the premises which were the subject of the mortgage."

This definite distinction is made by every reference by courts of last resort to *Bailey* v. *Smith,* although unfortunately not with the same degree of care and clarity used in the decision of Shauck, J., in *Timmerman* v. *Howell, et al, supra.*

As to the first class of cases above mentioned, the instant case definitely is contained. This is an action brought by the obligor (mortgagor) asserting a defense against the instrument held by the trustee (in the hands of an assignee without notice), and clearly falls within the rule of *Bailey* v. *Smith, supra.* An examination of every other authority presented by both plaintiff and defendant will find the relation of the parties, where the relief sought in the case has been denied, to be different from the relationship of parties existing in *Bailey* v. *Smith,* which is the rule only as to the first classification.

It is unnecessary for this court to attempt to improve upon the language of the late Chief Justice Shauck of the Supreme Court in the opinion already referred to.

This court therefore finds that the trust deed in the hands of the Ohio State Bank & Trust Company is vulnerable to the defense of usury, if usury has been proven.

By way of caution, and to further justify the findings in this action, this Court comments upon this, the most elaborate scheme of attempted confusion that has ever come to his attention. The method of securing the obligor,

the detailed and lengthy worded documents for the signature of one untrained in legal meanings, the contract of agency between the Southern Securities Company and Miller, attempting by mere words to deny its legal effect, the use of a number of small bonds of the obligors when a simple single instrument would suffice, the nomenclature of the collateral trust indenture and the nomenclature of the various contracts contained therein, referring to the bonds of the Southern Securities Company being collateral gold bonds whereas in fact they are primary undertakings, referring to a contract of guaranty, on page 27 of the collateral trust indenture, which is in effect a primary undertaking, and further continued and repeated attempts throughout the entire scheme to mislead and confuse the reader, disclose an ingenuity, put to the purpose that it is, which can hardly be commended.

By way of further caution this court comments that no instrument in the entire transaction may be examined in the first instance as one ordinarily approaches an honest instrument. What it purports to be must be entirely disregarded in view of the fact that this court has found in almost every instance that its actual legal effect was different from what it purports.

The court further finds as a fact upon the rule of usury heretofore expressed, that upon the basis of payment of interest and repayment on the principal required, that this loan in this case at a rate of interest of eight per cent would have been completely satisfied both by way of interest and by way of repayment of principal in the period of eight years and eleven months approximately, and that the overplus or excess of the amount sought to be charged for the use of this money for that period of time,—and it could not continue over that period of time if the amount of payments required and compelled extinguished the existence of the loan at that time—was in the amount of $466.38.

The plaintiff is therefore entitled to a credit against the amount claimed to be due by the trustee based upon the face value of the bonds and notes issued by the obligor to the extent of $466.38, and said trustee will be required to accept sum of money in full satisfaction of said trust deed, and will be ordered to cancel the trust deed.